(No. 20506.— )

HENRY J. CUNNINGHAM, Appellant, *vs.* CLARA WINTER-OTH, Exrx., Appellee.

*Opinion filed April 23, 1932.*

GUERINE & BRUST, and ODE L. RANKIN, for appellant.

COBURN, KEARNEY & COBURN, (MARSHALL V. KEARNEY, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

Henry J. Cunningham filed a bill in the superior court of Cook county on September 23, 1927, which prayed for an accounting of an alleged partnership between the complainant and A. E. Winteroth, the defendant, in a monument and

flower business; that the partnership be dissolved; that the title to certain real estate be decreed to be in Winteroth as trustee for the benefit of himself and the complainant; that Winteroth be decreed to perform specifically an alleged agreement to convey the real estate in question to Cunningham, and that he be enjoined from interfering with Cunningham's possession of the property. Winteroth answered the bill on September 30, 1927, and died on October 16, 1927. Clara Winteroth, his widow, who was joint tenant with him of the real estate and is executrix of his will, was made defendant, individually and as executrix, by a supplemental bill. She adopted his answer, which she afterward amended by leave of the court so as to set up the Statute of Frauds as a defense. The cause was referred to a master, who on March 1, 1930, made a report of the evidence, together with his findings and his recommendation that the bill be dismissed for want of equity. Exceptions to the master's report were overruled by the chancellor and a decree was entered that the bill be dismissed for want of equity, and upon a cross-bill filed by the defendant a writ of assistance was ordered to issue directing the sheriff to evict the complainant from the premises and deliver them to Clara Winteroth individually. The complainant has appealed from the decree.

The bill alleges that for more than ten years Cunningham had been in the monumental and floral business in the village of Hillside, which was conducted under the name of Cunningham Monumental Works; that in 1922 he leased a tract of land (which was described in the bill) adjacent to Mt. Carmel Cemetery from Mede J. Provost, upon which he erected buildings valued in the neighborhood of $4000, which he equipped with machinery and tools necessary for carrying on the monumental and floral business, and he also purchased a large stock of supplies and built up his business; that the lease provided that at any time during the term he should have the option to purchase the land for the sum

of $4500; that the leased premises lay directly opposite Mt. Carmel Cemetery and were an ideal location for the monumental and floral business, and that during the summer time, owing to its location and convenience, a large business in the sale of flowers and plants was conducted there; that Winteroth was in the wholesale florist business in the village of Forest Park and for many years Cunningham purchased flowers from him and during the summer months sold large quantities of plants and flowers purchased from Winteroth and had built up a lucrative business through those sales; that early in 1926 he was indebted to Winteroth in the sum of $1050 for plants and flowers purchased and was in arrears in the payment of his rent, and his landlord advised Cunningham that unless he exercised his option to purchase, Provost would forfeit the lease. It was further alleged that Cunningham immediately notified Winteroth that he (Cunningham) did not have the funds to purchase the property, and unless he was able to purchase it he would have to terminate his business as a stone-cutter and monument setter and he and Winteroth would lose the benefit of the location and business of selling flowers and plants; that Winteroth, for the purpose of protecting his florist business, which he would lose if Cunningham lost the lease, proposed to Cunningham that Winteroth would advance sufficient money to purchase the premises, and for the purpose of guaranteeing and protecting him for such advances the title should be taken in his name, and for the further security of such advances Winteroth took a bill of sale from Cunningham on all of the personal property upon the premises, and that Cunningham did not receive any money from Winteroth or any consideration for the bill of sale but that it was for the purpose only of securing Winteroth more fully for his advances. It is further alleged that Winteroth acted upon his suggestion and paid to Provost $4500, a deed of the property was executed by Provost to Winteroth, and Winteroth placed a $1500 mortgage on the premises and ad-

vanced $3000 for the purchase of the property; that on April 6, 1926, at the time of the delivery of the deed, Winteroth and Cunningham entered into a contract which provided that if Cunningham would pay to Winteroth at any time within two years the money advanced by Winteroth for the purchase of the premises, plus ten per cent bonus, Winteroth would convey the premises to Cunningham; that the contract provided that Winteroth was to share in the profits of the business conducted by Cunningham until Winteroth had received from the profits the amount which Cunningham owed for flowers and plants previously purchased; that since the execution of the agreement Cunningham has been in possession of the property and has devoted all of his time to the business and has sold more than $8000 worth of plants and flowers for Winteroth; that Winteroth has taken all of the money received from the sale of the flowers and plants and Cunningham received none of it, and that his profits from the sale of the plants and flowers amounts to more than $1050 which Cunningham owed Winteroth. The bill also alleged that a short time prior to the filing of the bill, Winteroth, knowing that the premises had increased in value, for the purpose of defrauding Cunningham out of his property and business had attempted to take possession of the premises and property, claiming that he was the owner of the property; that under the pretext of having the business audited he seized all of the books and documents possessed by Cunningham, together with the contracts mentioned and the lease between Cunningham and Provost and had refused to return or deliver the books, contracts or lease to Cunningham. The bill further alleged that from the time of entering into the agreement mentioned, Winteroth had collected a greater portion of the moneys coming into the business and refused accounting to Cunningham therefor, and that he (Cunningham) had tendered and stands ready and willing to tender and pay to Winteroth all of the moneys that may be due him.

Winteroth answered, admitting some of the allegations of the bill, but denying, among other things, that he ever saw a lease from Provost to the appellant or knew of its contents or of any option in it; alleging that the appellant's business was not profitable and he had become indebted to Winteroth for more than $1000 for plants and flowers and was heavily indebted to other people, and one of his creditors, being secured by a mortgage on the buildings used in the business, had taken steps to foreclose it early in 1926; that neither the appellant nor anyone else had ever informed the defendant that the appellant had an option to purchase the premises for $4500; that when the appellant stated his condition to Winteroth the latter proposed to buy the real estate for what the defendant thought it to be worth, taking title in his own name, and a bill of sale from the appellant conveying all of his buildings and the equipment used in the business, including the good will of the business, so that the appellant should have no ownership whatever in the property; that Winteroth was to become the sole owner and proprietor, not to be hampered or annoyed by any claims of the appellant or his creditors; that he would hire Cunningham as manager of the stone business, as Winteroth's employee, and for his services he should receive forty per cent of the net profits of the business but would not be authorized to collect any money, and if any money should come to his hands it was to be turned over to Winteroth. The arrangement so proposed was accepted by Cunningham. Winteroth bought the premises, paying $5500 for them and taking title in his own name, paid all past due rent, bought and supplied a stock for the business at an expense of over $4000, and caused signs to be placed upon the door of the place of business, "Cunningham Monumental Works—A. E. Winteroth, Proprietor." Checks used in the business were stamped with the same inscription. He became, and was, the sole and exclusive owner of the real estate and business and Cunningham had no further

interest except forty per cent commission or salary. Winteroth made all collections and banked the money in his own bank account. The answer further alleged that a public accountant was called in and made a correct account of the standing of the business, based upon details furnished by Cunningham showing its status. Winteroth was taken sick, went to a hospital and has remained bed-ridden, unable to give his personal attention to the collection of the money and the conduct of the business. At the time the accountant was called in, it was agreed that Cunningham's wages should be raised from forty to fifty per cent of the net profits of the business for his services as manager and employee. The accounts were cast upon that basis and assented to by Cunningham. Winteroth sent his wife to collect bills shown by the appellant's account to be due from customers. It was then learned that Cunningham had dishonestly collected money from customers, for which he had given receipts to the extent of thousands of dollars and appropriated the money to his own use. Winteroth then discharged Cunningham, who resigned in writing, and from that time was no longer in Winteroth's employ and had no rights of any kind in the business except obligations which he owed to Winteroth for wrongful collection and appropriation of money. Cunningham had a room in one of the buildings on the premises and lived there. He was ordered to vacate, but did not do so and remained a trespasser from that time on. Winteroth began a forcible detainer suit, which was pending when the answer was filed. Winteroth has already invested about $16,000 in the property and business, and is obligated to pay, and probably will have to invest, several thousand dollars more on claims for material and other things fraudulently ordered by Cunningham without Winteroth's knowledge or consent. Cunningham had not, nor ever had, the money to buy the property. The answer denied that Winteroth ever entered into an agreement that he would at any time within two years give back the

premises to Cunningham if he would pay the amount paid as the purchase price, plus ten per cent, or that Cunningham was to pay back to Winteroth out of the profits of the business the money which Winteroth had invested in the property. Cunningham has been paid his full salary and has appropriated several thousand dollars which did not belong to him. The answer denied that Winteroth had seized any books and papers in which Cunningham had any interest but the books and papers had been submitted to the accountant to ascertain the condition of the business. Cunningham had no interest in any of the documents except to ascertain the amount of his salary and willingly gave possession of them to the accountant. Among the papers was no contract relative to the premises belonging to Cunningham or in which he had the least interest. Winteroth never had possession of any lease between Provost and Cunningham or knew the terms of any such lease except that there was a large sum of back rent due Provost. Cunningham never made any tender of any sum or had anything to tender. He was neither willing to pay his just debts nor did he have anything with which to pay them.

The bill alleged the contract between Cunningham and Winteroth to have been made in writing and the burden was on the appellant to prove this allegation, but not only was there no evidence tending to prove any contract in writing except some testimony of Charles J. Wolf in regard to oral statements made by Winteroth in various conversations, but the statements testified to by Wolf did not even tend to prove the contract alleged in the bill, and the testimony of Winteroth was entirely inconsistent with it. Wolf testified that he had a conversation with Winteroth and Cunningham in the latter part of March, 1926, at the Citizens' Bank of Melrose Park, of which Wolf was president. Cunningham said that he had arrangements with Winteroth for some money to finance him for the operation of his business until he collected some money that was due him from insur-

ance companies in connection with a fire loss that had occurred previously. Winteroth said that was true—that he was advancing the money; that Cunningham could pay him back any time he wanted to, upon re-paying the amount that he put into the proposition, plus ten per cent, and while he was in with him as a partner in the business each was to receive fifty per cent of the profits of the business; that under the lease Cunningham had the privilege of purchasing the ground for $4500, and Winteroth would furnish the money to purchase the property as provided for in the lease; that he would take title to the property and hold it for Cunningham for fear that there might be creditors making claims against Cunningham which would encumber the title in case Cunningham took title to the property. Wolf told Winteroth that the bank had a chattel mortgage on the buildings, tools, equipment and stock of granite. Winteroth said that was all right and it might remain; that "you will be paid this sum of money what was due you;" that he was only interested in Cunningham so that he could establish for himself a place where he could dispose of and sell flowers to cemeteries which he was growing in his greenhouse. Another conversation occurred in April at the bank. Winteroth said he had taken title to the property; that there was a signed written agreement between himself and Cunningham whereby Cunningham could re-purchase and take over the property upon payment of the amount paid by Winteroth, ($4500,) plus ten per cent, at any time within a period of two years. Cunningham said that was correct, and that just as soon as he got the money from the insurance company he would buy out Winteroth and operate the business by himself again. Winteroth also said that he knew that Cunningham had creditors; that he was not doing this for the purpose of taking advantage of any other creditors, and that they were entitled to their moneys and they should have them. Wolf saw Winteroth and Cunningham after that in September of the same year, at the bank.

Winteroth told of the contract that he had with Cunningham, and that Cunningham had the right to re-purchase the property and take back the business at any time that he wanted to, within the two-year period of that contract. All the conversation was on the same line. Cunningham owed the bank a large sum of money before Winteroth bought the property. The bank had a chattel mortgage on the buildings, equipment and material and foreclosed the chattel mortgage, and Cunningham still owed the bank about $6000.

The summons in the cause was served on Winteroth on September 26, 1927, and he filed his answer September 30. A notice was served on the complainant's attorneys on September 26 to take the deposition of the defendant at his residence in Forest Park on October 3, and on this date the deposition was taken. In this deposition he gave a detailed account of the relations between himself and Cunningham which it is not necessary to set out at length, but, so far as concerns the contract, the substance of the deposition is as follows: He had been sick for some time—about nine months—and had no business. He had been a florist but had retired. He had known Cunningham seven or eight years and had had business relations with him, selling him flowers, which he sold at retail at his monument works near Mt. Carmel Cemetery. Cunningham came to him in April, 1926, and said that Wolf and two Italians wanted to take his place away and that he was trying to buy it from Provost, the owner. Cunningham owed him $1050 and asked him to buy the place. He owed rent to Provost. Winteroth told him that he was not fixed so well, though he had enough money to buy the property for him but did not want to go into the business. He told Cunningham that he would buy the place for Cunningham to protect him if he would take it back in a couple of years. Winteroth then went to the bank with Provost and got a deed for the property to himself for $5500, paying $4000 in cash and

giving a first mortgage for $1500. There was a bill of sale also of what Cunningham had on the ground—some stone monuments, some buildings, and what was inside the buildings that they were working with. Winteroth bought everything and Cunningham then went to work for him as a salesman. Cunningham was to get fifty per cent of the net profits on the stone after everything was paid, and Winteroth was to collect the money. He made collections for a time. Cunningham was to get so much a week and so much of the profits and was paid on that basis. Winteroth became sick in September, and since then had done hardly any business but had been confined to his bed. Cunningham collected money due for the stone business without any authority to do so. The bill relied upon a written contract which it purported to set out according to the legal effect of the writing. The answer denied that there was any such contract. The deposition of Winteroth showed, and the master found, that the contract between the appellant and Winteroth was not in writing. Since the proof does not sustain the allegations of the bill in regard to the contract the court properly dismissed the bill for want of equity regardless of any other question in the case. The bill relied on a contract whereby Winteroth agreed to buy the land and within two years convey it to the appellant upon the re-payment to him of the purchase price, plus ten per cent, and the employment of the appellant by Winteroth at a salary of ten dollars a week and fifty per cent of the net profits of the monument business. Before a party is entitled to a decree his allegations and proof must agree. (*Gregory* v. *Gregory,* 323 Ill. 380; *Field* v. *Field,* 319 id. 268; *Tucker* v. *Powell,* 318 id. 166; *Leahy* v. *Nolan,* 261 id. 219.) The court therefore properly dismissed the bill.

The decree granting the writ of assistance under the cross-bill found that Winteroth purchased the property on April 5, 1926, for $5500, taking the title in himself and his wife as joint tenants; that the appellant executed and de-

livered a bill of sale to Winteroth of all the buildings on the premises used as monument works and greenhouses; that Winteroth went into possession of the premises and business and placed the appellant in charge at a salary of $10 a week and fifty per cent of the net profits derived from the sale of monuments and flowers; that the appellant continued in that employment until July 30, 1927, when Winteroth charged him with collecting money on accounts in his hands and appropriating the money to his own use; that the appellant then signed and handed to Winteroth his resignation; that the appellant had not been employed for any definite term and thereafter he had no further right or authority to continue in the occupancy of the premises or to withhold the possession of the same from Winteroth or the appellee or to interfere with their ownership or right to possession; that since July 30, 1927, he has been in possession without paying any rent or remuneration whatever to the appellee for the use thereof, in spite of demands made upon him for the delivery of possession; that Winteroth died on October 16, 1927, and the appellee individually has since been the sole owner of the premises and entitled to possession. The court therefore ordered the writ to issue.

The evidence showed the conveyance of the land and the transfer of the business and equipment to Winteroth and his wife in joint tenancy and that they were at all times entitled to the possession of the property. Under the allegations and proof in this record the appellant was not entitled to an accounting either on the theory that he and Winteroth were partners or that he was an employee of Winteroth, whose salary was fixed by the net profits of the business, and when his bill was dismissed all the issues in the cross-bill were decided against him, and the decree awarding a writ of assistance was properly rendered.

The decree is affirmed.

*Decree affirmed.*